323-0427 Kanwar Aurora Eppley v. Tariq Shamsher Junejo and Afshan T. Junejo Appellants. Thank you. Good afternoon. Good afternoon, Your Honor. Good afternoon, Your Honor. Okay, Mr. Slobig, are you ready to begin? I am, thank you. You may proceed. Thank you. May it please the Court, I'm Robert Slobig. I represent the defendants appellants Tariq and Afshan Junejo. I have four principal points I want to make. I'll try to proceed briskly through them, but I'll certainly pause at any point to answer your questions. The first of the four is the Wage Payment Act claim. The evidence showed a violation of the Wage Payment Act by Dr. Aurora because Section 13 imposes personal liability on officers or agents who knowingly permit a wage act violation. The problem in the record below is that the trial court found that Afshan was not, in her words, a bona fide employee, thereby engrafting a new into the statute that the legislature did not put there. Weren't the checks written? Checks were written and Aurora forbade her from cashing them. How did he forbid her from cashing them? The evidence was that he instructed her not to cash the checks and that she did not. It was contrary evidence to that though also, wasn't it? I don't believe so. I do not think any evidence was introduced that the checks actually cleared the Drahe Bank. That would have, I think, put the matter to rest. Didn't he testify that he did that just at her request because she wanted to build her credit record? I think he said that he made her an employee and reported a salary for her to build her credit, but I don't recall that the explanation was specifically connected to the instruction not to cash the checks. Thank you. Besides this amorphous, unmanageable requirement about bona fides that the legislature never put in the act, the other problem here is that the judicial admissions of the counter-defendant, Dr. Aurora, should have taken the question of her employment off the table. He caused his business to issue her W-2 forms. He acknowledged his contractual promise to employ her at the Plainfield station. Dr. Aurora's accountant testified that Afshan was an employee. And so there was evidence of the amounts of the variable salary checks. And in the briefing, the plaintiff just doesn't respond to the argument we make that these were judicial admissions. When he put in the pleadings that she was an employee, that should have taken that question out of contention under the Dion versus McDonald's and the other judicial admission cases that we cited. The doctrine is pretty settled and clear. After a party makes a judicial admission, you don't get to explain it away or offer any contrary evidence. And then the final problem with the treatment of the court below on the employment issue is that she presumed a tax which shouldn't have been before the court in the first place because of the admissions, is that he was faking W-2 forms for her to improve her credit. Then that means that he's filing materially untrue tax returns for those businesses. That would be contrary to law. And it would be contrary to the common law principle that business transactions are presumed to be fair and honest unless the contrary is shown by clear and convincing evidence. We've cited multiple cases for that. So I don't think this record shows any clear and convincing evidence that they all decided to defraud the IRS and file fake tax returns in order to improve Afshan's credit. And in fact, the testimony was her credit didn't need any improving. So for all those reasons, we think the finding on the Wage Act claim has to be reversed. I'd like to turn, if I may, to the contract counterclaim where Judge Wheaton just lost track of my client's $532,000. The evidence was there that the Jenejos collateralized their home in order to finance the acquisition of the Plainfield Station. Judge Wheaton's ruling is just internally inconsistent. On the one hand, she says that the stock purchase agreement gave Dr. Arora all of the shares of Agzac, the company. And on the other hand, she says that the stock purchase agreement never became effective. That was an expression she basically parroted from the plaintiff's closing argument, that the agreement never became effective. The evidence didn't support it. Again, there was a judicial admission of the formation of the contract. In the verified answer to the counterclaim, Arora admitted the formation of the contract and the execution of the stock purchase agreement. His answer did deny that Afshan made that capital contribution, but the evidence certainly established it. And that was independent evidence, not just the testimony of the Jenejos. The independent testimony of Garrick Nielsen, the banker who oversaw the financing of this, and the documents themselves showed that the $532,000 contribution from the collateralization of the home came into the transaction. And it stands to reason also that the transaction did close. And if there were a half a million dollar gap in the financing, I don't see how it could possibly have closed. The plaintiff called an expert, Aaron Hollis, who also conceded that the Jenejos did contribute the $532,500 from the equity in their home. But contrary to the documents and contrary to the other witnesses' testimony, she speculated that this money was for other investments, like the King Drive gas station in Chicago, which has no support in the evidence. Aaron Hollis, the expert, then went on to say that 100% she did not really know, and those were her words, 100% I don't know. But the stock purchase agreement by which Dr. Arora came to own the shares of Agzac had an express obligation in it that upon transfer of that station, which he did, and that was uncontested, that he would owe that money back to Afshan. He should have returned the $532,500 to her, and he did not. So the evidence of the breach was clear. And Judge Wheaton just would not enforce that breach against Arora. She ruled that it never became effective, but that can't be squared with her concomitant finding that the agreement was effective because she found that he owned the shares of the business, and that stock purchase agreement, the same contract, is how he got the shares of the business. So those inconsistent findings just can't stand. And based on plaintiff's admissions, that that contract was formed, and the rest of the evidence that the contract was performed, that finding that there was no breach must be reversed because otherwise Judge Wheaton just permitted Dr. Arora to walk off with $532,000 of our client's money that was promised to them. All right. The barring of the expert is tied into that issue, and this is my third point. Expert witnesses help the fact finder with complex evidence, and because of that doctrine, this court's ruling in Besco v. Hensley, Monica and Hensley, teaches that we don't bar an expert even when there's a discovery violation where the trial court can fashion a more reasonable remedy to balance the interests of all the parties because expert testimony helps the fact finder understand these complex issues. And Judge Wheaton did need help, she said so, understanding the complex accounting issues here. And we cited Henderson, it's error to exclude the testimony of an expert where the defendant has complied with the discovery request. That doctrine applies here because... Is there anything in the record that explains why your first expert refused to testify? I think there is. I do not recall the exact circumstances, and perhaps when it's Mr. Wheaton did a wise and I think appropriate thing that honored the rule in the Besco case. She limited Natasha Escobedo's testimony, and that's the replacement expert, to the opinions that were already disclosed by Kenneth Rappaport in January of 2023. And she said that Escobedo must produce her file and sit for deposition by June 30th, 2023. So plaintiff thus had the disclosed opinions since January. The plaintiff got Escobedo's file on June 30th, but then plaintiff sandbagged by not requesting the deposition. And then after the time had passed, moving to bar the And the trial court just should not have gone along with that. The trial court... The depth supposed to be have taken place by the same date that the disclosure was made? That's right. The order allowing the substitution of the experts assigned the same deadline for the depth and the disclosure of the file. I don't know how wise that was, but that's the record. What we submit is that it was incumbent on the plaintiff to say, here's the date I want to take this deposition. And I wouldn't have blamed him if he said, here's the date I want to take the deposition, and I don't want to get the file the same morning or that afternoon of the deposition. I want the file ahead of time. All of that's reasonable. And I think all of that was in the contemplation of the first order of Judge Wheaton, the one that I've got compliments for. Where she went off the rails is dealing with the aftermath of the plaintiff letting June 30 pass without taking the deposition. What she could have said was, well, you don't get that deposition because you didn't ask for it. I think that would have been reasonable, but she didn't even have to do that. Under BESCO, I think she could have said, well, take that deposition now because you didn't ask before June 30th, get it done. And open up the deadline of June 30th to say, you know, the second week of July, what's the harm? It's hard for me to see how the plaintiff even needed that deposition in view of the circumstances that the opinions had already been disclosed since January and the order allowing the substitution of the experts locked in the new expert to the former expert's opinions. So she couldn't stray from what had already been disclosed. And I'm not saying he should have been barred from taking this deposition, but I'm saying that we shouldn't be prejudiced by his decision, I mean plaintiffs, to let the June 30th deadline slip by without even asking to get that deposition on the calendar. And again, that's because the purpose of an expert is to aid the trier of fact in understanding the complex issues that are beyond the ken of a lay person. And Judge Wheaton shouldn't have deprived herself of this independent professional opinion concerning the transactions at issue, especially in the circumstances of this case, where we had Aaron Hollis, an expert who wanted to testify that money should be allocated to contrary to what the parties said it should be allocated to, and where we had the trial judge herself saying that it looked like voodoo economics to her. So we had disclosed opinions that would have refuted the opinions of the plaintiff's expert, Aaron Hollis, and in order to have a fair trial, those expert opinions should have been heard at trial. That expert should not have been barred, particularly when Hollis based her opinions on speculation and not on the party's testimony. And so it's really no wonder that Judge Wheaton lost track of my client's $532,500, because the evidence was there, but she just didn't understand it, and the expert would have helped her to understand it. And under the BESCO case, the remedy is a new trial, that she should have heard that evidence and gotten a new trial. I see I'm close to out of time. My final point is on the membership interests. Which parties owned what interest in each of the companies was established by the documents, and the trial court should not have deviated from that. She made findings about who owned what percentages of each that didn't line up to the evidence. I see my time has expired. I'll see you in rebuttal, and thank you for your attention. Are there any questions for Mr. Slobod? Okay. Thank you. Mr. Moore. There we go. Thank you, Your Honor. I think the statement that a 30-year chancery judge, who's now chief chancery judge of the 18th Judicial Circuit, lost track of anything in this case is shocking. She didn't lose track of the $532,000, and it didn't hinge on expert testimony or the lack of expert testimony. It was clear throughout the entire record what happened, that the Gennagos didn't put anything into the acquisition of two stations, Joliet and King Drive. They had solicited this gastroenterologist to invest his retirement money to make it grow, and Gennagos said, I'll run the stations, but it will be 50-50 partners. We'll split everything. That was the operating agreement. It was an oral operating agreement, and my client knew that an LLC was formed for Joliet, and he knew that one was formed for King Drive, and in the process of acquiring those stations for substantial amounts of money, the evidence was clear that the Gennagos didn't put a penny into the acquisition of Joliet or King Drive, both stations worth more than $1 million. Rather, what they did is they said, okay, there's a third station, Plainfield, which it actually turns out that Gennagos owned. I don't think my client, the evidence was my client didn't even know it at the time. Gennagos said, I'll give you 100% of this station, and I'll put my house up. I can't do it directly. I can't go to the bank. My credit's bad. I can't go to the bank and get a loan on my own, but I'll throw my house into the mix, reduce your purchase price, and that'll be my contribution to the acquisition of the other two stations, and that's what happened. The fact that there was- Ask a question very quickly. I thought they had equity in the Joliet store, Joliet gas station. Claimed to, but there was no documents ever produced about it. It was only his own testimony, and the only document he had was a HUD statement. HUD statement shows the purchase price was $1.2 in the credit, or buyer payment was issued for $325, and my client, it's uncontested, contributed $275,000 of that, so I don't know what equity he had, and there was nothing other than his own testimony, which the judge found incredible because he was impeached time after time after time. So was Afshan. I can't even go into all the examples, but it's clear in the Joliet store that he had a lot of credibility. So they put in their house in Plainfield, not pursuant to the stock purchase agreement, which Mr. Slobing makes so much of. No, no, no, no. The trial testimony was that there was a bill of sale, and I apologize. I footnoted this in my brief. This exhibit somehow got missing from the record, but there's plenty of testimony about it. It was Plaintiff's Exhibit 36. Jonejo, Terry Jonejo, sold 100% of the shares of Exact LLC and 100% shares of Exact Gas and Food Mart to Aurora for $2.7 million plus inventory. That's how the sale happened. This purchase agreement, stock purchase agreement, which the judge found correctly had never become effective, was a separate deal. And what it contemplated was that if, in this case, Afshan Jonejo pawned it up, I think it was 25% of the down payment price towards the purchase, she would get 25% of the profits of the station. And that agreement never was effective because they never pawned up the money. It was something like $135,000. There was no evidence induced at trial that they paid that money. So the judge correctly found that that agreement never became effective. So what that meant was Aurora was the 100% owner of Plainfield, and both the parties were 50% owners of the other two stations. Now, just talking about Plainfield, that's where Afshan, pursuant to the stock purchase agreement, claims that she should have been an employee or whatever. There's no judicial admission in this case. Admitting that they asked for paychecks and that they were given paychecks is not an employee. It's an admission that paychecks were given. There's no illegality. As I said in the brief, this isn't a public or governmental entity. The market would normally deter an employer from paying somebody who never worked there. But the evidence at trial was overwhelming. Antonio Francisco has managed that station for 10 years, continuously. He testified Afshan Jonejo did no work at home or in the shop. And she testified she was there multiple times a week, at least weekly, to directly supervise Antonio Francisco in the ordering of gas and the stocking of merchandise in the C store. He, who had no stake in the case whatsoever, testified that wasn't true. And the judge, looking at all the other incredible statements that the Jonejos made on other points, determined that Francisco was credible and there was no evidence that Jonejo was actually an employee. So how can you give a wage claim if you're not an employee? Furthermore, she testified that, and I think the accountant testified, and by the way, the accountant was the accountant for both Jonejo and Aurora in these stations. He testified that checks were sent. And Afshan even testified she received them but didn't cash. Well, she's received the check, so I'm not saying she was ever entitled to them. But if she received them, how can it possibly be a violation? The fact is that when you assess this case, it's really all a factual dispute. There's no issues that are required to NOVA review. Even the stock purchase agreement, which nobody contested it existed. Everybody agreed it existed. Our argument was it never was effective. So there's no construction of a contract as a matter of law that requires a NOVA review. All we're talking about here is the weight of the evidence. And these are people who came to court and they said, even though my client wrote checks saying he's purchasing shares in the Joliet operating entity A&A Gas, even though he signs up on bank documents as a director of A&A Gas Corp, they testified that my client invested $1.7 million just to be an owner of the real estate with no evidence that he would ever get any rent or the evidence that they were going to flip it quickly and make money. The claim is absurd. They went into business to operate gas stations. They went into basically a partnership in the form of an LLC to operate gas stations and share the profits. But the Genajos came and said, no, he was only the owner of the real estate. Yes, I asked them, but what about the inventory that they bought? That you charged them for, which there's no documentation for, but you charged them a couple hundred thousand dollars for inventory. Oh, well, that's part of the real estate. It was ridiculous. Their testimony was just ridiculous. As far as the expert, there was a notice of deposition issued. It was issued on March 2nd, 2023. No response was ever received. They brought a motion to compel. We learned at the hearing that Mr. Rappaport fled the case, refused to testify, and they had a new expert. The judge said, fine. The new expert, and I had asked that the new expert's opinion be limited to the expressed opinions of Rappaport given the closeness of trial, and that went in the order. The order was, okay, produce your file and have her sit for deposition by June 30th, 2023. Nothing happened. On June 30th, 2023, I got a report, not a file. Did not get a file. I got a report, and I didn't get a file, and so I moved the bar because we're basically a month away from trial. I had disclosed an expert a year and a half ago, a year and a half before, and produced a report and then an amended report, and the court faced with not only the violation of discovery rules, but the violation of her order barred the expert, and that is clearly within her discretion, so there was no error. In the briefs, the defendant argued that the trial court erred in applying the LLC Act, but he didn't argue today in oral argument, but that argument should be rejected because this isn't a case about ANA gassing Food Mart. The evidence was Aurora, who's practicing medicine in Kenosha, Wisconsin. He didn't care how they ran the stations. It was understood they were going to run the stations, and if they needed an operating entity to buy gas, they can have an operating entity to buy gas. He doesn't care. He just wants 50% of the profit in return for his investment. The agreement at issue in this case was the oral operating agreement to which the LLC Act does apply, so that argument should be rejected. I believe I've covered all of my points. Is there such a thing as reserving time or not? It's not that I'm aware of. I have some questions, Justice McCabe, that might fill some of this void. First of all, the trial date was about 45 days. Am I correct? Am I mad? I think you had an August trial date. I think it was August 11th. I assume that at least the other side argued that they could notice this deposition up. You would have a month and a half to take a doubt at that point in time, but the judge obviously decided not to do that. Correct? She decided not to do it, and the argument from the defendant was Mr. Moore blew it by not taking this deposition on the 30th because actually they offered him for a deposition, and I said, are you kidding me? I don't have a file. I just got the report today. How can I take the deposition? I don't recall ever getting the file, and her ruling was, I don't know if the transcript was ordered or not, but her ruling was she doesn't know a lawyer that would depose an expert without the file. So there was no discussion from the defense about accommodation that I recall. They were simply arguing that basically I blew it because I didn't depose him on the 30th, and the court rejected that argument. And Mr. Moore, as it relates to the 500 and some thousand dollars, what is your strongest argument that that money was to go to the other two investments, Joliet and Chicago, as opposed to Plainfield? I know part of it is the fact that the paperwork that day showed your client is 100% owner. What else do you have? Well, ironically, it's the testimony of the only non-party witness that the defense called, which was Garrett Nielsen. He's the realtor who did the deal, and what he said was when he was doing the deal, Jonejo was standing around the station anxious to sell it to Aurora because he wanted to get into King Drive. King Drive was a cash cow, and Garrett Nielsen remembered that because he wanted to do the deal for King Drive, and that didn't come to pass. It was with another realtor, but what he testified was, yeah, he thought that the 532 was for Jonejo interest in Plainfield, but he's never in 30 years ever seen a transaction like that where it wasn't stated in the paperwork that the person contributing the money had an interest in the station, and here it's totally clear that the Jonejos have no interest in Plainfield, and there's a reason for it, and the reason was they didn't have the cash. They wanted to use the equity in their house to become partners, which they did in the other two stations. Is there anything in the record that explains who set up all of these LLCs or corporations? Who was doing the legal work for this operation? You know, there's a, in my mind, a black hole of office space down there where this accountant lives, and there's a lawyer down there who was tangentially involved in the case. I have no idea, quite frankly, and if you read the, actually, if you read the only written operating agreement, which is the one for King Drive, it's incomprehensible, and it's like a form pulled down off the internet that doesn't even apply to Illinois. I don't even know what it's about. Everybody just ignored it. There is actually a written operating agreement for King Drive, but nobody made anything of it because it's incomprehensible, but to answer your question, I don't know and still don't know who the lawyers were. It didn't come out in the record, then, to answer my question. There's nothing in the record that I need to find. All right, thank you very much, Mr. Moore. Thank you. Okay. Thank you, Mr. Moore. Thank you. Mr. Slobod, any rebuttal? A little bit. Thank you, Your Honor. I heard Mr. Moore use the expression zero credibility with reference to my clients. I want to point out that our arguments do not depend on the evaluation of the credibility of Afshan Tariq Junaid. We recognize the principles that the trial court gets to make that call because she heard the trial and saw the witnesses, but that's why the arguments that we've made that demonstrate the error in those rulings are not based on the credibility of our parties, but on the plaintiff's own admissions, on the testimony of the plaintiff's accountants, sorry, Mr. Bates, and on the documents themselves, areas in which the credibility is not in question. On the matter of the stock purchase agreement never becoming effective, that is a contract formation concept. If an offer goes unaccepted, the contract never became effective. If a condition precedent never occurs, the contract never became effective. But in this case, and the record is clear on this, the formation of the contract was admitted in the pleadings. There was no controversy over formation. So, ergo, there is no argument that the contract never became effective. What's really going on here is the contract became effective, but the trial court just didn't want to enforce it. And the record doesn't support that, and that's why reversal is required there. On the matter of the possibility of the 532,000 going to some other investment, yes, there was reason to speculate that there was other opportunities that they were looking at, but the documents and the testimony, including the testimony of Garrick Nielsen that counsel invoked, were all that the collateralization of the home went to the down payment for Plainfield. And Mr. Moore has conceded here that Mr. Nielsen, the banker, did think that that money was for Plainfield. And I should point out, look at what Dr. Aurora got out of that deal. Even though Nielsen thought it was weird that someone would put up a piece of the down payment and not get an ownership interest in the real estate, we have a transaction that was proved at trial that Afshan was obligated to put up 25% of the down payment in return for a share of the profits, not a share of the real estate. Dr. Aurora walked away with 100% of the operating company, 100% of the real estate, and all of Afshan's money that he was obligated under the stock purchase agreement to return to her if he transferred that real estate and operation to another company he owned, which is exactly what he did. And then finally, I couldn't help noticing Mr. Moore's expression about Dr. Aurora, the practicing physician, and his attitude toward the transaction documents. The expression was, he doesn't care. And I think the record bears that out. He doesn't care what the written agreements he signed says. He doesn't care whether he was dealing with a limited liability company or a corporation. He doesn't care what his obligations were under the stock purchase agreement. All of that was just paper to him, and he didn't care. He disregarded his obligations under all those instruments. Well, I don't think the law gives them a right not to care. He took on contractual obligations. His breach was proved, and the trial court should have awarded relief against him. And for all those reasons, we respectfully ask for reversal of the judgment below in accordance with the arguments in the briefs. Any further questions? No. Thank you, Your Honor. Thank you very much. We thank you both for your arguments this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible.